# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ‖ | |
| Plaintiff, | ‖ | No. CR14-4081-MWB |
| vs. | ‖ | **REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS** |
| TERESA ANN SIMEON, | ‖ | |
| Defendant. | ‖ | |

_____

## I.    INTRODUCTION

Defendant Teresa Ann Simeon is charged by indictment (Doc. No. 2) with (a) conspiracy to distribute a controlled substance and (b) possession with intent to distribute a controlled substance.  She has filed a motion (Doc. No. 23) to suppress certain evidence.  Plaintiff (the "Government") has resisted the motion (Doc. No. 28).  The Trial Management Order (Doc. No. 10) assigns motions to suppress to me to conduct any necessary evidentiary hearings and to prepare reports on, and recommended dispositions of, those motions.

I held an evidentiary hearing on March 12, 2015.  Assistant United States Attorney Jack Lammers appeared on behalf of the Government.  Simeon appeared personally and with her attorney, Robert Tiefenthaler.  The Government offered the testimony of Matthew Benson, Nathan Sands, Todd Trobaugh, James Bauerly and Wendell Nope.  Simeon offered the testimony of Kyle Heyen.  The following exhibits were admitted into evidence:

*Government Exhibit 1*:    USPCA Certification - Detector Dog

*Government Exhibit 2:*    USPCA Certification - Patrol Dog

| *Government Exhibit 3:* | K9 Monthly Training Reports |
| *Government Exhibit 4:* | CAD Dispatch Report |
| *Government Exhibit 5:* | Video of Dog Sniff- Full Length |
| *Government Exhibit 5a:* | Video of Dog Sniff- Edited Length |
| *Government Exhibit 6:* | Advisement of Rights Form- Teresa Simeon |
| *Government Exhibit 7:* | Affidavit in Support of Search Warrant Application |
| *Government Exhibit 8:* | Wendell Nope Expert Report |
| *Government Exhibit 9:* | Video and Audio Recording of Security Office Interview |
| *Defense Exhibit A:* | Curriculum Vitae of Kyle Heyen |
| *Defense Exhibit B:* | Kyle Heyen Expert Report |

The hearing reconvened on March 18, 2015, for the presentation of oral arguments. The motion is now fully submitted and ready for decision.

## II.  SUMMARY OF THE EVIDENCE

*Events inside the Casino.*  On the morning of October 3, 2014, a housekeeper at the WinnaVegas Casino & Resort (Casino) found a small baggie containing a white crystalline substance on a pillow in hotel room 418.  Believing the baggie contained drugs, she reported it to Tribal Police Officer Matthew Benson.  Benson seized the baggie from the room, took it to the Casino's security office and performed a field test on the substance.  The field test was positive for methamphetamine.  Benson then contacted the front desk to determine who had rented room 418.  Teresa Simeon was the registered renter of the room.  Benson reviewed security footage from the hallway near the room

and determined that no one other than Simeon, a male (who was later determined to be Simeon's husband) and the housekeeper had entered or exited room 418 during the relevant period of time.

Benson then searched the premises for Simeon and found her on the Casino floor. He asked her to accompany him to the security office for questioning. She complied. Once in the security office, Benson advised Simeon of her rights and presented her an Advisement of Rights form, which she signed at 1:32 p.m. Benson then questioned Simeon about the methamphetamine found in her room. Simeon denied having any knowledge of it. Benson told Simeon that he had done his research. He explained that he knew she resided in Wayne, Nebraska, that he had contacted law enforcement there and that they were aware of her.

Because Simeon is not a tribal member, Benson advised her that she would be detained while he contacted the Woodbury County Sheriff's Office (WCSO). At that point, Simeon requested to speak with her husband and asked if she could call her lawyer. Benson stated that she could call her lawyer but indicated that she would need to use her personal cell phone because he would be using to the security office phone to call WCSO.

Mr. Simeon was brought into the security office at 1:42 p.m. He, too, was advised of his rights and signed an Advisement of Rights form. Benson then asked him about the methamphetamine. Mr. Simeon denied any knowledge of the narcotics or how they appeared in their hotel room. Meanwhile, Simeon placed a call on her iPhone. She asked the recipient of the call to pick up her vehicle at the Casino. After the call, Simeon asked Benson what would happen to her vehicle and if she could give the keys to someone. Benson told her it would be up to the WCSO but that he would normally let her have a friend retrieve the vehicle.

In response to Benson's call, WCSO dispatch contacted Deputy Nathan Sands. He advised dispatch that he was available to respond and, indeed, was only about eight to ten miles away from the Casino. Sands was dispatched to the Casino at 1:47 p.m. According to the WCSO's records, he arrived at the Casino security office at 1:54 p.m.

Benson briefed Sands about the situation in a hallway outside the security office while Simeon and her husband remained in the office.

Sands entered the security office at 1:58 p.m. and questioned Simeon about the methamphetamine found in her hotel room. He testified that both Simeon and her husband appeared to be very nervous during the discussion. When asked about prior drug use, Simeon admitted she had used methamphetamine the day before but denied that the methamphetamine in the room belonged to her. She also denied having any guests in the room. Sands then asked Simeon if her vehicle was in the parking lot. She responded by stating that it probably had been picked up by a friend and was no longer at the Casino.

Sands believed this to be a lie because Simeon resides near Sioux City and any friend driving from the Sioux City area would not have had time to arrive at the Casino and retrieve the vehicle in such a short amount of time. He asked Simeon why she would have had someone pick up her vehicle. She answered: "Because I figured I was going to be arrested." Sands then asked about prior arrests. Simeon responded that she had been arrested for drugs while her husband stated that he had been arrested for a DUI and a few other minor offenses long ago.

Sands asked Simeon if his drug dog would detect drugs if he deployed the dog around her vehicle. Simeon answered "no." Sands followed up by asking when she last had methamphetamine in the vehicle. Simeon initially answered that she had never had drugs in her vehicle but, when pressed, changed her answer to "it's been a real long time ago." Sands then told Simeon that he did not believe she or her husband were being honest with him and that he knew they were very nervous about something.

Sands left the security office at 2:04 p.m. and called his supervisor for directions as to how he should proceed. He described the positive field test, the fact that Simeon was the registered renter of the hotel room and her nervous behavior and evasive answers. Based on this information, the supervisor directed Sands to place Simeon under arrest for possession of a controlled substance.

Sands came back into the office at 2:11 p.m. He again asked Simeon about the location of her vehicle and she again stated that she thought someone from Sioux City had already picked it up. Sands then asked what type of vehicle she drove. Simeon looked at her husband, who shook his head, shrugged his shoulders and said something to the effect of "it's up to you." At that point, Simeon stated that she wanted to talk to an attorney. Sands placed Simeon under arrest at 2:12 p.m. and advised her that her vehicle could not leave the parking lot until he had conducted a dog sniff.

***Events in the Casino Parking Lot.*** After Simeon was placed under arrest, another deputy arrived to transport her to the county jail. Meanwhile, Sands searched the parking lot for Simeon's vehicle. Because Simeon had declined to provide information about the vehicle, Sands started running every Nebraska license plate in the parking lot until he found one registered to Simeon. He testified that he located the vehicle about 30 minutes after his initial arrival at the Casino.

After locating the vehicle, Sands deployed his canine, Rico, for a free air sniff of the exterior of the vehicle. A Casino security video camera recorded a time-stamped video of the sniff. The video indicates that it started at approximately 2:30:35 p.m. and ended just over one minute later, at 2:31:40 p.m. Sands testified that a strong wind was blowing across the vehicle from the passenger's side towards the driver's side.

Sands and Rico began the sniff on the driver's side rear panel and proceeded to walk counterclockwise around the vehicle toward the passenger side door. They made their way to the front of the vehicle and then around to the driver's side. Sands testified that upon approaching the driver's door, Rico became more intense and his breathing changed. According to Sands, this was Rico's natural, untrained "alert" to the odor of narcotics. Rico then jumped up and placed his front paws on the driver's window. Rico also jumped onto and scratched at the driver's door seam and on the window of the back door. Sands had maintained a continuous pace around the vehicle, pointing to various areas for Rico to smell, until Rico jumped at the driver's door. At that point, Sands paused for approximately four seconds before he took a few more steps toward the rear

5

of the vehicle. Rico continued to scratch at the driver's door and door seam. After Rico made his third jump onto the vehicle, Sands rewarded him with a toy ball and placed him back into his patrol car. Sands testified that Rico's three jumps and his scratching on the driver's side of the vehicle were his indications that he smelled narcotics and was pinpointing the source.

Sands then returned to the Casino security office, told Mr. Simeon that the vehicle would be searched and asked him for the key. Mr. Simeon complied. Sands returned to the parking lot, opened the vehicle and had Rico sniff the interior. Sands testified that Rico alerted and indicated on a black bag inside the car. Sands opened the bag and found twenty-three individually packaged baggies of methamphetamine (totaling approximately 125 grams), a digital scale and a Nebraska driver's license issued to Simeon. An officer assisting with the search found a Samsung phone on the front seat, along with Simeon's Social Security card. Sands then contacted the Tri-State Drug Task Force and had Simeon's vehicle towed to the police department. Later, during a more thorough search of the vehicle, officers found a cooler containing twenty individually packaged baggies of methamphetamine (totaling approximately 416.8 grams) hidden inside.

Sands documented Rico's sniff in a report written two days later. Sands wrote that Rico indicated only one time – at the passenger door on the B pillar. He did not specify which passenger door. He also stated that Rico "began sniffing heavily on the driver's door, eventually picking his nose up to the door handle area and actually lifted the door handle with his muzzle." This action does not appear on the video recording of the sniff. Sands also wrote that Rico rose up on his back legs near the passenger side of the vehicle but stated that this was not an alert or indication.

***Training and Certification.*** In April 2013, with the help of Deputy Todd Trobaugh, Sands purchased Rico from a breeder in the Netherlands. The team went through a two-to-three week bonding period prior to beginning police dog training. They then began training both on their own and with the WCSO K-9 Unit. When the team

6

trained on their own, they were often assisted by Trobaugh, who is certified as an instructor by the Randy Hare School for Dog Trainers.

Sands testified that the team's training began with Rico "imprinting" and becoming familiar with the four drug odors he would be deployed to detect: marijuana, methamphetamine, cocaine and heroin. Once Rico learned these odors, the team used drug boxes and scratch boxes as training tools. Various drugs are placed in the boxes for the dog to detect. As Rico gained experience at detecting the drug odors, Sergeant James Bauerly, who leads the WCSO K-9 Unit, made the puzzles and hides more difficult. The team trained indoors and outdoors, both with other K-9 teams and on their own, and with drugs hidden in vehicles, under furniture, in cabinets or in other difficult locations. The team trained almost daily until March 2014, when they underwent a certification test through the United States Police Canine Association (USPCA). Sands and Rico passed the test. On March 19, 2014, the USPCA certified the team for drug detection. Bauerly and Trobaugh testified they believed Rico was a very competent and well-trained police dog.

The USPCA certification process involved a one-day test that included an indoor and outdoor section.[1] The indoor section consisted of three rooms, two with hidden drugs and one without drugs. The outdoor section included five vehicles, two with hidden drugs and three without drugs. Sands was not aware of the location of the drug hides when the team completed the test. Rico's certification test was judged by eight individual judges. Bauerly and Trobaugh were judges for Rico's certification test but the other six judges were not affiliated with the WCSO. Rico detected all four drug hides. Sands testified that Rico had no false positive indications during either round. Rico began patrolling in April 2014, about one month after his USPCA certification.

After Rico and Deputy Sands were certified, they continued with maintenance training but did not train as frequently as they had prior to certification. The team

---

[1] The outdoor section of the test is actually held inside a large garage.

attended training sessions approximately once a week with Bauerly and the K-9 Unit. These sessions are documented in training logs and grids that Bauerly maintains for the K-9 Unit. During 2014, Sands and Rico participated in 91 practice hides during WCSO K-9 training. The records indicate that Rico had three false positive indications for the odor of drugs during those practice sessions. Bauerly testified that based on his experience, Sands and Rico trained more than enough to maintain their reliability and were in compliance with all USPCA standards and WCSO training requirements.

*Expert Testimony.* Sergeant Wendell Nope testified for the Government. He has been training police dogs and handlers for 30 years and serves as the K-9 Training Supervisor for the Peace Officer Standards and Training (POST) Division of the Utah Department of Public Safety. He is also a certified judge for various agencies and competitions, including the State of Utah, the Utah Peace Officer Association K-9 Trial, the Regional Police Dog Championship, the United States National Police Dog Championship and the International Law Enforcement Games K-9 Competition.

Nope testified that in his opinion, based on his review of records, Sands and Rico were well-trained, were certified by a bona fide police dog organization and were completely-functional as a narcotic detection team. He stated that in the police dog industry there is no uniform, standard number of hours required for initial or maintenance training. He also explained that the training methods taught by the Randy Hare School, which were used to train Rico, are accepted and highly respected in the industry. In Nope's opinion, Sands and Rico participated in a sufficient amount of training. He commended WCSO on the level of detail in the training records and its candor in documenting mistakes. He stated that despite three false positives during training in 2014, Rico was a highly competent and reliable canine. Nope pointed out that according to the training records, two of the false positives occurred on the same day and that remedial and corrective action was taken immediately. He also explained there are several reasons why a drug dog may falsely indicate during training, including the

possibility that prior training on the same day might leave behind residual drug odors. He found it to be significant that Rico had not had another false positive since June 2014.

Based on his review of the video recording, Nope testified that the free air sniff of Simeon's vehicle was "practically textbook." He stated that from the video alone, he could tell that the team was either very gifted or had a significant amount of training. Nope explained that there was no standard practice in law enforcement for conducting a free air vehicle sniff but, rather, each team has its own system for doing so. He testified that Sands and Rico executed a perfectly-acceptable sniff around Simeon's vehicle. He observed that Rico was intense and ready to work upon exiting the patrol car and that Sands guided Rico to the target vehicle and tapped on the rear panel of the vehicle to indicate to Rico that he should begin his work. He testified that Sands then continuously moved around the vehicle and only pointed to areas on the vehicle Rico had skipped. Nope stated that these actions did not improperly cue Rico to indicate.

Nope further testified that he observed Rico indicate on the driver's door by jumping up on the door and scratching at the window and door seam. He also explained that Sands then properly slowed his progress to give Rico time to pinpoint the exact source of the odor. According to Nope, this pause by Sands did not improperly cue Rico to indicate because he had already indicated by jumping on the vehicle. Nope also stated that Sands did not give Rico his ball, as a reward, until after Rico had indicated. He testified that rewarding a drug dog after an indication is not inappropriate and does not cue the dog to indicate falsely. In short, Nope concluded that Sands and Rico were a well-trained and reliable drug-detecting team and that the free air sniff of Simeon's vehicle was conducted in a proper manner.

Kyle Heyen testified as an expert for the defense. He is a private consultant and the owner of Detector Dogs International, Inc. He previously worked in law enforcement for 11 years and was trained and certified in police dog detection under the Utah standards. In fact, Heyen participated in Nope's training class. Heyen's certification expired in 1996 and he has not actively participated in training a dog team since 2002.

Heyen reviewed Rico's training records and the video of the free air sniff. He testified that in his opinion, Rico was not a well-trained police dog and the sniff of Simeon's vehicle was not reliable. Heyen testified that the training logs for Sands' and Rico's training in during 2013 and 2014 were not detailed enough to establish that Rico was well-trained and reliable. He took issue with Bauerly's narrative records of the various training sessions, stating they were not specific to Sands and Rico but, instead, also included exercises and hides involving other dog teams. Heyen also noted that the training Sands and Rico did on their own, outside of the official department training, was not documented or narrated.

Heyen testified that without documentation of the training Sands and Rico conducted on their own, they could not be considered well-trained. He also testified that there is no documentation that Rico "imprinted" on the four primary drug odors when he first began his training as a police dog. Thus, according to Heyen, there is no way to determine whether Rico actually learned those odors and can reliably detect them. Finally, Heyen took issue with the lack of detail in Rico's field-deployment records. He testified that based on the minimal documentation of Rico's actual performance in the field, it is impossible to determine if Rico is reliable.

In Heyen's opinion, the free air sniff of Simeon's vehicle was flawed and unreliable. He testified that the video reflects no true indication or alert behavior from Rico. Heyen stated that Rico placed his paws on the vehicle five separate times: (1) on the back rear panel when the sniff began, (2) on the front passenger door, (3) on the driver's door, (4) a second jump on the driver's window and (5) on the door seam between the front seat and back seat. In Heyen's opinion, there were no significant differences in Rico's behavior during these events, meaning there is no way to distinguish the alleged indications from non-indications. Moreover, Heyen testified that Sands cued Rico to jump and seemingly indicate at the driver's door by stopping his progress. He testified that the handler should remain moving at a steady pace during a free air search and that by stopping, the handler is signaling for the dog that it is time to indicate. Heyen also

testified that Deputy Sands improperly cued Rico to indicate by removing the toy ball from his pocket before Rico reached the back of the vehicle and concluded the sniff.

Heyen was also critical of the fact that Sands had Rico sniff only one vehicle in the parking lot. According to Heyen, a handler should have the dog sniff multiple vehicles, much like conducting a photo line-up. On cross-examination, however, Heyen acknowledged that there is no industry standard requiring that a team sniff multiple vehicles.

Additional facts will be discussed as necessary below.

## III. DISCUSSION

Simeon challenges every aspect of her detention and the free air sniff that led to the search of her vehicle. First, she argues that she was detained for an unreasonable amount of time before the sniff was conducted. Next, she argues that the vehicle was outside the scope of her detention and arrest and that it should have been released to her husband rather than being sniffed and searched. In addition, she argues that the sniff did not establish probable cause to search the vehicle because it was not conducted properly and the dog and handler lacked sufficient training to demonstrate reliability. Finally, she argues that a subsequent search warrant was invalid because it was issued in reliance on the allegedly-illegal search of her vehicle. For all these reasons, Simeon contends that her Fourth Amendment right against unreasonable searches and seizures was violated and that all resulting evidence must be suppressed. I will discuss each of Simeon's arguments separately.

### A. Unreasonable Detention and Undue Delay

#### 1. Applicable Standards

Law enforcement officers may, in appropriate circumstances and in the appropriate manner, approach a suspect for the purposes of investigating possible

criminal behavior, even though there is not probable cause to arrest the suspect. *Terry v. Ohio*, 392 U.S. 1, 22 (1968). Officers must have a reasonable and articulable suspicion to make an investigatory stop and detain the suspect. *United States v. Montano-Gudino*, 309 F.3d 501, 504 (8th Cir. 2002); *see also United States v. Bustos-Torres*, 396 F.3d 935, 942 (8th Cir. 2005). Reasonable suspicion arises when an "officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrants suspicion that a crime is being committed." *United States v. Houston*, 548 F.3d 1151, 1153 (8th Cir. 2008). The question of whether a reasonable and articulable suspicion exists to support an investigatory stop is determined in light of the totality of the circumstances as a whole, *Bustos-Torres*, 396 F.3d at 942, rather than as discrete and disconnected occurrences. *United States v. Hightower*, 716 F.3d 1117, 1121 (8th Cir. 2013).

While there is no rigid time limit on an investigatory stop, a stop may be too long if it involves "delay unnecessary to the legitimate investigation of the law enforcement officers." *United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994). An investigative detention may last no longer than necessary to effectuate the purpose of the stop and the investigative methods employed should be the least intrusive means reasonable to verify or dispel the officer's suspicion in a short period of time. *Id.* at 916 (quoting *United States v. Willis*, 967 F.2d 1220, 1224 (8th Cir. 1992)).

### 2.    Analysis

Simeon argues she was detained for an unlawful amount of time prior to Sands and Rico performing the dog sniff on her vehicle. She contends she was initially detained by Benson and that the detention was unreasonably lengthened in order for Sands to arrive and conduct a dog sniff on her vehicle. Simeon claims she was detained for over an hour and during that hour she was questioned by both officers and had to wait while Sands found her vehicle and conducted the free air sniff. She argues that this period of detention was unreasonable and resulted in an unconstitutional search of her vehicle.

The Government argues that under the circumstances, Simeon's detention was not unreasonably long. I agree and, indeed, find that this is not even a close call. When Benson located Simeon on the Casino floor and asked her to accompany him to the security office, he was aware of particularized, objective facts warranting a reasonable belief a crime had been committed. Specifically, a housekeeper had discovered a baggie that appeared to contain narcotics in a hotel room, the room had been registered in Simeon's name and Benson's field test of the substance indicated that it was methamphetamine. Benson's initial detention of Simeon for investigatory purposes was not unconstitutional.

Nor was the duration of the detention. Based on Benson's unrefuted testimony, Simeon was detained shortly before 1:30 p.m.[2] She was questioned briefly by Benson before he determined that the WCSO would have to handle the investigation because Simeon is not a member of the Winnebago Tribe. Sands was dispatched to the Casino at 1:47 p.m. and arrived at the security office at 1:54 p.m. After an initial discussion with Benson, Sands began questioning Simeon soon after his arrival. The interview thus began approximately 30 minutes after Simeon was first detained. There is no evidence that this short delay was intentional or resulted from anything other than the fact that it took some time for a deputy to travel to the scene.

While this case does not involve a traffic stop, traffic stop cases are instructive in analyzing Simeon's claims of prolonged detention and unreasonable delay. In *United Stated v. Donnelly*, 475 F.3d 946 (8th Cir. 2007), the Eighth Circuit Court of Appeals explained that there is no "rigid timeline limitation for an investigatory stop" and suggested that a rigid time limit would undermine the importance of allowing authorities to graduate their responses to the demands of a particular situation. *Id*. at 953. The court upheld a one-hour delay in deploying a drug dog for a sniff after a traffic stop based

---

[2] The Advisement of Rights form indicates that Simeon signed it at 1:32 p.m. Benson testified he presented the form to Simeon and asked her to sign it a few minutes after they arrived at the security office. The video recording of the interview confirms this.

13

on the fact that the officer asked standard questions regarding contraband and the defendant answered irregularly. *Id.* The officer's reasonable suspicion was strengthened rather than alleviated by the questioning, which justified the deployment of the drug dog and the prolonged detention. *Id.* (citing *United States v. Barahona*, 990 F.2d 412, 416 (8th Cir. 1993)).

The same is true here. After Sands arrived at the Casino and questioned Simeon, his suspicions of drug trafficking and possession were only heightened, rather than alleviated. He testified that while he was questioning Simeon and her husband, both appeared to be very nervous – so much so that he could see Mr. Simeon's neck pulsing. Simeon admitted to using methamphetamine the day before and to having a prior arrest for a drug-related crime. She also insisted that her vehicle had already been removed from the parking lot – a claim Sands reasonably (and accurately, as it turns out) believed to be false due to the short amount of time that had passed. Moreover, while admitting to very recent methamphetamine use, Simeon initially claimed that she had never had drugs in her vehicle before changing her answer to state that it had been a "real long time ago." All of this information, when added to the fact that methamphetamine had been found in a room registered to Simeon, justified prolonging Simeon's detention. She was ultimately placed under arrest for possession of a controlled substance at 2:12 p.m., approximately 45 minutes after being detained.

A further, but short, delay naturally ensued as Sands attempted to locate the vehicle in the parking lot – a task made more difficult by Simeon's decision to provide no information about the vehicle.[3] Once Sands located the vehicle, the free air sniff was conducted immediately. As noted above, the sniff was completed just over one hour from the time Simeon was initially detained by Benson. A substantial portion of the delay was caused by Simeon's own evasive conduct. Simeon was not detained longer than

---

[3] Of course, Simeon had the right to decline to answer Sands' questions – whether about her vehicle or otherwise. I simply note that her refusal to provide information about her vehicle had the natural effect of making Sands' search for the vehicle more difficult and time consuming.

necessary to effectuate the purpose of the detention.  I find that neither the detention itself nor its duration violated Simeon's constitutional rights.

**B.      *The Warrantless Search of the Vehicle***

### 1.      *The Automobile Exception*

The Fourth Amendment protects persons against unreasonable searches and seizures.  U.S. Const. amend. IV.  Warrantless searches are *per se* unreasonable, with a few well-established exceptions.  *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005).  "The so-called 'automobile exception' permits police to conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Id*. at 1140-41.  "Probable cause is determined by the totality of the circumstances, *Illinois v. Gates*, 462 U.S. 213, 238 (1983), and exists when the facts are sufficient for a reasonable person to believe that contraband or evidence of a crime will be found in the place to be searched, *United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995)." *United States v. Martinez*, 78 F.3d 399, 401 (8th Cir. 1996).

### 2.      *Was There Probable Cause to Search the Vehicle Before the Sniff?*

The Government argues that Simeon's complaints about the validity of the free air sniff are irrelevant because Sands already had probable cause to search Simeon's vehicle without conducting that sniff.  That is, the Government contends that before Sands deployed Rico, there were sufficient facts for Sands to form a reasonable belief that Simeon's vehicle contained contraband or other evidence of a crime.  Simeon disagrees, arguing that her vehicle was sufficiently separate from the hotel room that no reasonable person would believe there would be contraband in her vehicle.  Based on the evidence presented, however, I conclude that probable cause existed to search Simeon's vehicle before Sands and Rico conducted the free air dog sniff.

The Government suggests, and I agree, the circumstances in this case are similar to those in *Martinez*. In that case, the Eighth Circuit Court of Appeals held that there was probable cause to support the warrantless search of a vehicle owned by the defendant because: (1) the vehicle was parked near the residence, (2) evidence of drug trafficking was found during the search of the residence, (3) two sources identified the defendant as a drug trafficker and (4) a vehicle registered to the defendant's wife had been used to transport drugs in the past. *Martinez*, 78 F.3d at 401. Here, methamphetamine was found in a hotel room registered to Simeon. The evidence, including Simeon's own admissions, indicated that no one other than Simeon, her husband and the housekeeper had entered the hotel room. After being detained, Simeon placed a phone call in which she sought to have the vehicle removed from the parking lot. She then falsely advised Sands that the vehicle had already been removed – a claim Sands disproved by locating the vehicle in the adjacent parking lot.

Moreover, Simeon admitted that she had used methamphetamine the previous day and that she had a prior drug-related arrest. Finally, Sands observed – based on his training and experience – that Simeon and her husband were very nervous while being interviewed. When considering the totality of the circumstances, the combination of these facts and observations was sufficient for a reasonable person to form a belief that contraband or evidence of a crime would be found in Simeon's vehicle. Thus, I find that the automobile exception permitted a warrantless search of that vehicle without deploying a drug dog. This means, of course, that I could recommend the denial of Simeon's motion to suppress without addressing the arguments and evidence relating to the free air sniff. Nonetheless, because this is a report and recommendation that is subject to review by Judge Bennett, I will analyze Rico's deployment.

### 3. Did the Free Air Sniff Establish Probable Cause?

#### a. Applicable Standards

A dog sniff of the exterior of a vehicle during a stop does not violate the Fourth Amendment. *United States v. Rivera*, 570 F.3d 1009, 1012 (8th Cir. 2009) (citing *Illinois v. Caballes*, 543 U.S. 405, 409-10 (2005)). "[A]n alert or indication by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person or for the search of a vehicle." *United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010), *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999). A drug dog is considered reliable when it has been "trained and certified to detect drugs and a detailed account of the dog's track record or education is unnecessary." *United States v. Olivera-Mendez*, 484 F.3d 505, 512 (8th Cir. 2007). The standard to establish probable cause "is no more demanding where police search an automobile based on probable cause without a warrant." *Id.* However, the court must also consider evidence which may detract from the dog's reliability. *See Winters*, 600 F.3d at 967 ("Contrary evidence 'that may detract from the reliability of the dog's performance properly goes to the credibility of the dog.'") (quoting *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994)). The relevant question is "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida v. Harris*, 133 S. Ct. 1050, 1058 (2013).

As noted above, once probable cause is established a vehicle may be searched without a warrant under the automobile exception to the warrant requirement. *United States v. Bloomfield*, 40 F.3d 910, 919 (8th Cir. 1994). If probable cause justifies the search of a vehicle, then it permits the search of every part of the vehicle and its contents that may conceal the object of the search. *Olivera-Mendez*, 484 F.3d at 512 (citing *United States v. Roos*, 456 U.S. 798, 825 (1982)).

17

### b.    Analysis

Simeon challenges the dog sniff and subsequent search of the vehicle by arguing (1) Rico was not properly trained or certified and, therefore, was not reliable, (2) Sands improperly cued Rico to indicate and (3) Rico did not legitimately alert or indicate to the odor of drugs.  Simeon contends that because of these flaws, Rico's free air sniff did not establish probable cause to search her vehicle.  The Government argues the sniff was reliable and – if probable cause did not already exist – provided Sands with probable cause to search the vehicle.  The Government contends that Rico was certified by a bona fide certification organization and that there is sufficient evidence to establish that he and Sands were properly trained and reliable.  The Government denies that Sands cued Rico to indicate and argues that Sands deployed Rico properly.

### i.    Was Rico Properly Trained, Certified and Reliable?

In *Harris*, the Supreme Court rejected a rigid, bright-line, evidentiary checklist based on "in the field hits or misses" in determining if a drug detection dog was reliable. *Harris*, 133 S. Ct. at 1056.   Rather, the Court determined "the better measure of a dog's reliability thus comes away from the field, in controlled testing environments." *Id.*   In explaining what is necessary to prove a dog's reliability the Court stated:

> [E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.

*Id.* at 1057.  In *Harris*, the State introduced substantial evidence of the dog's training and proficiency in finding drugs.  *Id.* at 1058.  He had successfully completed two separate training programs, a 120-hour program and an additional 40-hour program.  *Id.*  He had also been certified by an independent company but by the time of the vehicle search at

issue, the certification had expired. *Id.* There was documentation that the dog and his handler trained four hours per week with exercises designed to maintain their skills. *Id.* The testimony and written records confirmed that the dog always performed at the highest level during those training sessions. *Id.*

Here, Sands, Trobaugh and Bauerly testified that Rico had extensive training in drug detection. While Sands was a first-time dog handler, he was assisted in his training by two experienced trainers. Trobaugh is a certified dog trainer, instructor and judge for the USPCA certification tests. He has been a dog handler himself and has attended numerous classes in training dogs. Bauerly is a certified dog handler and judge for the USPCA. While he is not a certifier trainer or instructor, he has many years of experience handling dogs, judging dogs and training the WCSO K-9 Unit.

Sands explained that he and Rico trained nearly every day, on their own time and with the K-9 Unit, during 2013 in order to prepare Rico to be a drug detection dog and to pass the certification test. The training done on their own time often included training with Trobaugh. Their training sessions involved imprinting Rico on the major drug odors, using scratch boxes to hide narcotics, using reward-style training techniques and other training techniques in the Randy Hare method. In March 2014, Rico and Sands passed the USPCA certification test by finding all four drug hides and having no false positive indications. Rico was then certified as a drug detection dog and maintained that certification when he was deployed to sniff Simeon's vehicle.

After the certification test, Rico and Sands continued with maintenance training and also began active duty and deployments as a detector dog team. Rico's training was documented by Bauerly in his official training logs for the entire K-9 Unit. These logs included detailed narrations of each training session with information about what types of training tools were used, the narcotics that were hidden, the locations and heights of the hides, each dog's performance, any mishandling or mistakes by the team and the type, if any, of remedial training that occurred. According to the training logs, Rico had three false positive indications out of 91 training exercises in 2014.

Simeon argues that these training logs are not sufficient to prove Rico's reliability and training because (a) the logs are not adequately detailed, (b) documentation of the team's individual training is lacking and (c) there is a lack of field deployment statistics or documentation. Heyen testified he would have liked to see more detail about the certain training tools used, the remedial training implemented when necessary and Rico's response to those training techniques. He also testified that he could not determine Rico's reliability without the individual training records and field deployment records.

Despite these complaints, this case is akin to *Harris* in that the record contains substantial evidence detailing Rico's extensive training, reliability and success in his training exercises. In the controlled training environments, Rico had a documented success rate of approximately ninety-six percent, with only three false positives out of 91 exercises in 2014. Nope testified that the training logs were sufficient in their detail and adequately explained the training exercises, tools used and any remedial measures taken. In fact, Nope was impressed with the training logs and Bauerly's candor in detailing not only Rico's successes but also his failures.

In addition, it is undisputed that Rico passed his certification test in March 2014 and is certified as a drug detector dog by the USPCA. Nope, Trobaugh and Bauerly all testified that the USPCA is a well-respected national organization for police dogs. While Heyen testified that he is generally dissatisfied with the USPCA and believes the association's testing is too lax, I find that his complaints are insufficient to overcome the presumption of reliability that certification from a bona fide organization carries. The USPCA is a bona fide police dog organization, provides a legitimate certification and supports the presumption that Rico is a well-trained and reliable detector dog. *See United States v. Gonzalez*, ___ F.3d ___, 2015 WL 1283832, at *5 (8th Cir. Mar. 23, 2015). Simeon has referred me to no case holding otherwise. Nor have I located any such case through my independent research.

Like Heyen's complaints about the USPCA, his critique of Rico's training and the WCSO's training records are based solely on his subjective beliefs. He acknowledged

that there are no recognized industry standards requiring the higher levels of training and documentation he advocates. His opinions are similar to the rigid, checklist standards the Supreme Court rejected in *Harris*. While I do not doubt that he sincerely believes greater levels of training and documentation are desirable, I find that his beliefs are contrary to *Harris*. In light of *Harris*, and upon consideration of all of the evidence presented, I find that the Government has established that as of October 3, 2014, Rico was a properly trained, certified and reliable drug detector dog.

### ii. *Did Sands Conduct the Free Air Sniff Properly?*

As noted above, Heyen testified that Rico was not deployed correctly. Specifically, he took issue with (a) Sands' failure to initiate a free air sniff around other vehicles in the parking lot and (b) alleged cueing behavior by Sands, including coming to a stop while on the driver's side and reaching into his pocket for Rico's toy ball. With regard to having Rico conduct sniffs of surrounding vehicles, Heyen acknowledged that this is simply his personal "gold standard" of how to complete a sniff. He admitted, and Nope agreed, that there is no standardized deployment practice for drug detector dogs and that each team has its own methods for completing a free air sniff. Here, the evidence demonstrates that Sands and Rico deployed in their usual manner. Nope testified he had no concerns with the team's standard deployment practice and that he considered the free air sniff of Simeon's vehicle to be "textbook." Simeon has failed to show that the sniff was unreliable due to Sands' failure to have Rico sniff other vehicles in the parking lot.[4]

As for Heyen's opinion that Sands cued Rico to indicate, Nope, Trobaugh, Bauerly and Sands each testified otherwise. Based on their review of the video, they explained that Sands properly stopped his progress only after Rico had already indicated to the odor

---

[4] It is not clear how Heyen's proposed "multiple vehicles" requirement would be feasible in a traffic-stop situation. For example, would law enforcement be required to stop other vehicles at random, in addition to the already-stopped suspect vehicle, to create the equivalent of a police lineup for the drug detector dog?

of drugs by jumping on the driver's door. That is, Sands paused to allow Rico to "work" by pinpointing the precise source of the odor. Heyen acknowledged that this technique of allowing a drug dog to "work" is an appropriate reason to change the dog's pace around the vehicle and is not a cue. His interpretation of the video, however, is that Sands stopped *before* Rico's behavior changed, thus cueing the behavior.

Having reviewed the video many times, I disagree. Rico's behavior changed noticeably when he rounded the front corner of the vehicle and began sniffing the downwind, driver's side. He became more intense, jumped on the vehicle and began scratching before Sands stopped moving. I reject Heyen's claim that Sands stopped first and that Rico's behavior changed only after that event occurred.

I likewise reject Heyen's opinion that Sands improperly cued Rico by reaching for his toy ball. Again, the video shows otherwise. Rico had already jumped and scratched on the driver's side of the vehicle two times before Sands reached into his pocket. Sands testified, and Nope, Trobaugh and Bauerly agreed, that this was Rico's indication to the odor of drugs. In short, based on the testimony and, more importantly, the video recording, I reject Simeon's allegation that Sands cued Rico to indicate.

### iii.     Did Rico Indicate?

Again relying on Heyen's testimony, Simeon argues that Rico did not actually alert or indicate on her vehicle. Heyen testified that the video depicts no change in Rico's behavior that could be characterized as either an alert or an indication. In his opinion, Rico's behavior of jumping on the driver's door was no different from other instances in which Rico placed his paws on the vehicle. He further testified that he did not see or hear[5] any change in Rico's breathing, body posture or intensity, causing him to conclude that Rico never entered alert status and therefore, did not truly indicate. In Heyen's

---

[5] The video recording does not include audio.

opinion, Rico was not consistent in his behavior, jumped on the vehicle in three different places and did not indicate there was an odor of drugs on the vehicle.

Nope explained an alert is a natural, untrained response to the odor of drugs, such as a change in behavior, breathing, intensity or body language. He testified that this natural, untrained response precedes a true indication and reveals that the dog senses the odor of drugs in the area. The dog then indicates by engaging in trained behavior. Some dogs display aggressive indication behavior (*e.g.,* scratching or biting at the source of the odor) while others indicate passively (*e.g.,* by coming to a stop and sitting at the source). Sands testified that Rico indicates aggressively by biting and/or scratching.

Nope, Bauerly and Trobaugh each testified that the dog's handler is in the best position to know when the dog's natural behavior changes because that handler has trained with the dog and can notice small changes in the dog's general demeanor. Here, Sands testified that immediately before jumping on the driver's door, Rico's behavior, intensity, body language and breathing changed from what they had been before Rico reached that location. That is, according to Sands, Rico went into alert status.[6] I find that this testimony is credible, as it is corroborated by other witness testimony and, to some extent, the video recording. While the video does not (and cannot) reflect whether Rico's breathing changed, it does show that his behavior changed when he came around to the driver's side of the vehicle. At that point, he repeatedly jumped and scratched on the driver's door. While he had briefly placed his paws on the side of the vehicle at least one other time during the sniff, the jumping and scratching that occurred on the driver's side is, quite plainly, different and more intense. I find, based on the witness testimony

---

[6] Sands testimony about Rico's breathing and alert is corroborated by the other witness testimony and the video of the sniff. It is clear on the video that Rico's demeanor and behavior changed when he jumped and scratched on the driver's door. Based on the witness testimony, it follows that prior to that indication, Rico would enter alert status and his breathing and overall intensity would change as well.

and my own review of the video, that Rico entered alert status and then indicated at the driver's side of the vehicle.

An indication by a properly trained and reliable detector dog gives an officer probable cause to search a vehicle. *Winters*, 600 F.3d at 967. I have already concluded that Rico was properly trained, certified and reliable as of October 3, 2014. As such, and because the Government has established that Rico indicated to the presence of drugs, I find that the free air sniff established probable cause for law enforcement to conduct a warrantless search of the vehicle and its contents. The search did not violate Simeon's Fourth Amendment rights.

### 4. Alternatively, Did the Combination of the Free Air Sniff and Other Information Known to Sands Establish Probable Cause?

The Government argues that even if (a) probable cause did not exist before the free air sniff and (b) the sniff itself was not entirely reliable, all the facts and circumstances that existed at the conclusion of the sniff established probable cause to search the vehicle. While it is not necessary to reach this argument, I will address it because it presents an additional, alternative basis for denying Simeon's motion.

In *Winters*, the Eighth Circuit stated:

> The ultimate issue was probable cause to arrest Winters and search his person and car. Even if a drug dog's "performance record raises questions about his reliability"... the issue is whether "the totality of the circumstances present at the scene" provided probable cause to search.

*Winters*, 600 F.3d at 968. The court found that while there was no evidence presented to cast doubt on the dog's past reliability, if there was reason to doubt the dog's reliability, the sniff could nonetheless be included in an evaluation of the circumstances as a whole to determine whether probable cause existed. *Id.* Those circumstances included (a) the defendant's body tremors and dilated pupils, (b) a strong "chemical" smell, (c) furtive movements by the defendant and his mother, (d) the defendant's refusal to keep his hands

in view and (e) earlier observations of actions that were consistent with drug trafficking. *Id.* The court held that these facts, when added to the dog's alerts, "clearly supported the district court's ruling that the officers had probable cause" to search, without a need for a hearing on the dog's training and reliability. *Id.*

In this case, taking all the circumstances in their totality, the facts are easily sufficient for a reasonably prudent person to believe Simeon had illegal drugs in her vehicle. As noted earlier, when Sands conducted the search he knew that methamphetamine had been found in a hotel room registered to Simeon and that no one else (other than Simeon's husband) had entered or exited the hotel room before the housekeeper. Simeon admitted to Sands that she had a prior drug arrest and had used methamphetamine the day before. Simeon made an effort to have someone else retrieve her vehicle from the Casino lot and then falsely represented to Sands that it had already been removed. Simeon and her husband displayed nervous behavior and Simeon gave inconsistent statements as to how long it had been since she last had drugs in her vehicle.

In addition to these facts, a trained and certified drug detector drug then indicated to the odor of narcotics in the vehicle. Even assuming that the outcome of the free air sniff was not sufficiently reliable, standing alone, to establish probable cause, it is nonetheless another factor to weigh in considering the totality of the circumstances. *Winters*, 600 F.3d at 968. I find that the information already known to Sands, when combined with the outcome of Rico's free air sniff, established probable cause to search the vehicle even if neither the information nor the sniff, standing alone, would have.

## C.    *Subsequent Searches*

After Simeon's vehicle was searched, the Government applied for and obtained a warrant to search two cell phones, one that was in Simeon's possession at the time of her detention and arrest and one that was located in her vehicle. Simeon argues that if the search of her vehicle was illegal, then any evidence found during the subsequent searches of her phones must also be suppressed as fruits of the poisonous tree.

I have already found that the search of Simeon's vehicle was supported by probable cause – and thus was constitutional – on three alternative theories: (1) probable cause existed before the free air sniff, (2) the free air sniff, by itself, established probable cause and, in any event, (3) the combination of the free air sniff and other information known to law enforcement established probable cause. As such, I find it unnecessary to address Simeon's challenge to the warrant that authorized the search of her cell phones. Because the evidence the Government relied upon to obtain that warrant was gathered lawfully, there is no basis to suppress the evidence gathered upon the execution of that warrant.[7]

## IV. CONCLUSION

For the foregoing reasons, I find that evidence obtained from the search of Simeon's vehicle, and from the subsequent search warrant that followed, should not be suppressed. Therefore, I RESPECTFULLY RECOMMEND that Simeon's motion to suppress (Doc. No. 23) be **denied**.

**IT IS SO ORDERED.**

**DATED** this 7th day of April, 2015.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE

---

[7] Simeon does not contend that the warrant was invalid due to a lack of probable cause to support its issuance. Instead, she argues that the evidence establishing probable cause was gathered illegally. Doc. No. 23 at 7, ¶¶ 20-21.