**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

UNITED STATES OF AMERICA,

               Plaintiff,

vs.

TERESA ANN SIMEON,

          Defendant.

No. CR14-4081-MWB

**MEMORANDUM OPINION AND ORDER REGARDING MAGISTRATE'S REPORT AND RECOMMENDATION CONCERNING DEFENDANT'S MOTION TO SUPPRESS**

---

**TABLE OF CONTENTS**

I.    **INTRODUCTION AND BACKGROUND**................................................2
    A.    *Procedural Background* ...........................................................2
    B.    *Factual Background* .............................................................3

II.   **LEGAL ANALYSIS** ..................................................................13
    A.    *Standard Of Review* ............................................................13
    B.    *Objections To Report and Recommendation*................................18
          1.    *Newly raised issues*......................................................18
          2.    *Probable cause to search car before dog sniff*......................22
          3.    *Probable cause to search car after dog sniff*........................24
               a.    *Rico's training and certification* .............................26
               b.    *The free air sniff*...............................................28
               c.    *Rico's indication* ...............................................29
          4.    *Combination of free air sniff and other information*
              *establishing probable cause* ..........................................30
          5.    *Subsequent searches*....................................................30

III.  **CONCLUSION** ......................................................................31

## I. INTRODUCTION AND BACKGROUND

### A. Procedural Background

On October 8, 2014, a criminal complaint was filed against defendant Teresa Ann Simeon, charging her with possessing with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). Subsequently, on October 23, 2014, an indictment was returned charging Simeon with conspiracy to distribute 500 grams or more of a methamphetamine mixture which contained 50 grams or more of pure methamphetamine, having previously been convicted of a felony drug offense (Count 1), in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846, and 851, and possessing with the intent to distribute 500 grams or more of a methamphetamine mixture which contained 50 grams or more of pure methamphetamine, having previously been convicted of a felony drug offense (Count 2), in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 851.

Simeon subsequently filed a motion to suppress in which she seeks to suppress evidence seized from her car and all evidence derived from that search. Simeon contends that she was detained for an unreasonable amount of time before the dog sniff was conducted. Next, she argues that her car was outside the scope of her detention and arrest and that it should have been released to her husband. She also argues that the dog sniff did not establish probable cause to search her car because it was improperly conducted and the dog and handler had insufficient training to be reliable. Finally, Simeon contends that a search warrant issued subsequently was invalid because it was issued in reliance on evidence obtained during the illegal search of her car. The prosecution filed a timely resistance to Simeon's motion. Simeon's motion to suppress was referred to United States Magistrate Judge Leonard T. Strand, pursuant to 28 U.S.C. § 636(b). Judge Strand conducted an evidentiary hearing and then filed a Report and

Recommendation in which he recommends that Simeon's motion to suppress be denied. In his Report and Recommendation, Judge Strand initially concluded that neither Simeon's investigatory detention nor its duration violated her constitutional rights. Judge Strand next found that probable cause existed to search Simeon's car before Deputy Sands and Rico, his drug detection dog, conducted a free air dog sniff. Alternatively, Judge Strand determined that the prosecution established that Rico was a properly trained, certified, and reliable drug detector dog at the time of the free air dog sniff at issue here, that Sands conducted the free air dog sniff properly, and that Rico alerted and then indicated at the driver's side of Simeon's car. Thus, Judge Strand concluded, alternatively, that the combination of the free air dog sniff results and other information known to Sands established probable cause to search Simeon's car. Finally, Judge Strand determined that, because the evidence the prosecution relied upon to obtain the search warrant for Simeon's cell phones was gathered lawfully, there was no legal basis to suppress the evidence gathered from the execution of that search warrant.

Simeon has filed objections to Judge Strand's Report and Recommendation. The prosecution filed a timely response to Simeon's objections. I, therefore, undertake the necessary review of Judge Strand's recommended disposition of Simeon's motion to suppress.

### B. Factual Background

In his Report and Recommendation, Judge Strand made the following factual findings:

> ***Events inside the Casino****. On the morning of October 3, 2014, a housekeeper at the WinnaVegas Casino & Resort (Casino) found a small baggie containing a white crystalline substance on a pillow in hotel room 418. Believing the baggie

contained drugs, she reported it to Tribal Police Officer Matthew Benson. Benson seized the baggie from the room, took it to the Casino's security office and performed a field test on the substance. The field test was positive for methamphetamine. Benson then contacted the front desk to determine who had rented room 418. Teresa Simeon was the registered renter of the room. Benson reviewed security footage from the hallway near the room and determined that no one other than Simeon, a male (who was later determined to be Simeon's husband) and the housekeeper had entered or exited room 418 during the relevant period of time.

Benson then searched the premises for Simeon and found her on the Casino floor. He asked her to accompany him to the security office for questioning. She complied. Once in the security office, Benson advised Simeon of her rights and presented her an advisement of Rights form, which she signed at 1:32 p.m. Benson then questioned Simeon about the methamphetamine found in her room. Simeon denied having any knowledge of it. Benson told Simeon that he had done his research. He explained that he knew she resided in Wayne, Nebraska, that he had contacted law enforcement there and that they were aware of her.

Because Simeon is not a tribal member, Benson advised her that she would be detained while he contacted the Woodbury County Sheriff's Office (WCSO). At that point, Simeon requested to speak with her husband and asked if she could call her lawyer. Benson stated that she could call her lawyer but indicated that she would need to use her personal cell phone because he would be using to [sic] the security office phone to call WCSO.

Mr. Simeon was brought into the security office at 1:42 p.m. He, too, was advised of his rights and signed an Advisement of Rights form. Benson then asked him about the methamphetamine. Mr. Simeon denied any knowledge of the

narcotics or how they appeared in their hotel room. Meanwhile, Simeon placed a call on her iPhone. She asked the recipient of the call to pick up her vehicle at the Casino. After the call, Simeon asked Benson what would happen to her vehicle and if she could give the keys to someone. Benson told her it would be up to the WCSO but that he would normally let her have a friend retrieve the vehicle.

In response to Benson's call, WCSO dispatch contacted Deputy Nathan Sands. He advised dispatch that he was available to respond and, indeed, was only about eight to ten miles away from the Casino. Sands was dispatched to the Casino at 1:47 p.m. According to the WCSO's records, he arrived at the Casino security office at 1:54 p.m. Benson briefed Sands about the situation in a hallway outside the security office while Simeon and her husband remained in the office.

Sands entered the security office at 1:58 p.m. and questioned Simeon about the methamphetamine found in her hotel room. He testified that both Simeon and her husband appeared to be very nervous during the discussion. When asked about prior drug use, Simeon admitted she had used methamphetamine the day before but denied that the methamphetamine in the room belonged to her. She also denied having any guests in the room. Sands then asked Simeon if her vehicle was in the parking lot. She responded by stating that it probably had been picked up by a friend and was no longer at the Casino.

Sands believed this to be a lie because Simeon resides near Sioux City and any friend driving from the Sioux City area would not have had time to arrive at the Casino and retrieve the vehicle in such a short amount of time. He asked Simeon why she would have had someone pick up her vehicle. She answered: "Because I figured I was going to be arrested." Sands then asked about prior arrests. Simeon responded that

she had been arrested for drugs while her husband stated that he had been arrested for a DUI and a few other minor offenses long ago.

Sands asked Simeon if his drug dog would detect drugs if he deployed the dog around her vehicle. Simeon answered "no." Sands followed up by asking when she last had methamphetamine in the vehicle. Simeon initially answered that she had never had drugs in her vehicle but, when pressed, changed her answer to "it's been a real long time ago." Sands then told Simeon that he did not believe she or her husband were being honest with him and that he knew they were very nervous about something.

Sands left the security office at 2:04 p.m. and called his supervisor for directions as to how he should proceed. He described the positive field test, the fact that Simeon was the registered renter of the hotel room and her nervous behavior and evasive answers. Based on this information, the supervisor directed Sands to place Simeon under arrest for possession of a controlled substance.

Sands came back into the office at 2:11 p.m. He again asked Simeon about the location of her vehicle and she again stated that she thought someone from Sioux City had already picked it up. Sands then asked what type of vehicle she drove. Simeon looked at her husband, who shook his head, shrugged his shoulders and said something to the effect of "it's up to you." At that point, Simeon stated that she wanted to talk to an attorney. Sands placed Simeon under arrest at 2:12 p.m. and advised her that her vehicle could not leave the parking lot until he had conducted a dog sniff.

***Events in the Casino Parking Lot***. After Simeon was placed under arrest, another deputy arrived to transport her to the county jail. Meanwhile, Sands searched the parking lot for Simeon's vehicle. Because Simeon had declined to provide information about the vehicle, Sands started running every

Nebraska license plate in the parking lot until he found one registered to Simeon. He testified that he located the vehicle about 30 minutes after his initial arrival at the Casino.

After locating the vehicle, Sands deployed his canine, Rico, for a free air sniff of the exterior of the vehicle. A Casino security video camera recorded a time-stamped video of the sniff. The video indicates that it started at approximately 2:30:35 p.m. and ended just over one minute later, at 2:31:40 p.m. Sands testified that a strong wind was blowing across the vehicle from the passenger's side towards the driver's side.

Sands and Rico began the sniff on the driver's side rear panel and proceeded to walk counterclockwise around the vehicle toward the passenger side door. They made their way to the front of the vehicle and then around to the driver's side. Sands testified that upon approaching the driver's door, Rico became more intense and his breathing changed. According to Sands, this was Rico's natural, untrained "alert" to the odor of narcotics. Rico then jumped up and placed his front paws on the driver's window. Rico also jumped onto and scratched at the driver's door seam and on the window of the back door. Sands had maintained a continuous pace around the vehicle, pointing to various areas for Rico to smell, until Rico jumped at the driver's door. At that point, Sands paused for approximately four seconds before he took a few more steps toward the rear of the vehicle. Rico continued to scratch at the driver's door and door seam. After Rico made his third jump onto the vehicle, Sands rewarded him with a toy ball and placed him back into his patrol car. Sands testified that Rico's three jumps and his scratching on the driver's side of the vehicle were his indications that he smelled narcotics and was pinpointing the source.

Sands then returned to the Casino security office, told Mr. Simeon that the vehicle would be searched and asked him

for the key. Mr. Simeon complied. Sands returned to the parking lot, opened the vehicle and had Rico sniff the interior. Sands testified that Rico alerted and indicated on a black bag inside the car. Sands opened the bag and found twenty-three individually packaged baggies of methamphetamine (totaling approximately 125 grams), a digital scale and a Nebraska driver's license issued to Simeon. An officer assisting with the search found a Samsung phone on the front seat, along with Simeon's Social Security card. Sands then contacted the Tri-State Drug Task Force and had Simeon's vehicle towed to the police department. Later, during a more thorough search of the vehicle, officers found a cooler containing twenty individually packaged baggies of methamphetamine (totaling approximately 416.8 grams) hidden inside.

Sands documented Rico's sniff in a report written two days later. Sands wrote that Rico indicated only one time – at the passenger door on the B pillar. He did not specify which passenger door. He also stated that Rico "began sniffing heavily on the driver's door, eventually picking his nose up to the door handle area and actually lifted the door handle with his muzzle." This action does not appear on the video recording of the sniff. Sands also wrote that Rico rose up on his back legs near the passenger side of the vehicle but stated that this was not an alert or indication.

*Training and Certification.* In April 2013, with the help of Deputy Todd Trobaugh, Sands purchased Rico from a breeder in the Netherlands. The team went through a two-to-three week bonding period prior to beginning police dog training. They then began training both on their own and with the WCSO K-9 Unit. When the team trained on their own, they were often assisted by Trobaugh, who is certified as an instructor by the Randy Hare School for Dog Trainers.

Sands testified that the team's training began with Rico "imprinting" and becoming familiar with the four drug odors

8

he would be deployed to detect: marijuana, methamphetamine, cocaine and heroin. Once Rico learned these odors, the team used drug boxes and scratch boxes as training tools. Various drugs are placed in the boxes for the dog to detect. As Rico gained experience at detecting the drug odors, Sergeant James Bauerly, who leads the WCSO K-9 Unit, made the puzzles and hides more difficult. The team trained indoors and outdoors, both with other K-9 teams and on their own, and with drugs hidden in vehicles, under furniture, in cabinets or in other difficult locations. The team trained almost daily until March 2014, when they underwent a certification test through the United States Police Canine Association (USPCA). Sands and Rico passed the test. On March 19, 2014, the USPCA certified the team for drug detection. Bauerly and Trobaugh testified they believed Rico was a very competent and well-trained police dog.

The USPCA certification process involved a one-day test that included an indoor and outdoor section. The indoor section consisted of three rooms, two with hidden drugs and one without drugs. The outdoor section included five vehicles, two with hidden drugs and three without drugs. Sands was not aware of the location of the drug hides when the team completed the test. Rico's certification test was judged by eight individual judges. Bauerly and Trobaugh were judges for Rico's certification test but the other six judges were not affiliated with the WCSO. Rico detected all four drug hides. Sands testified that Rico had no false positive indications during either round. Rico began patrolling in April 2014, about one month after his USPCA certification.

After Rico and Deputy Sands were certified, they continued with maintenance training but did not train as frequently as they had prior to certification. The team attended training sessions approximately once a week with Bauerly and the K-9 Unit. These sessions are documented in training logs and grids that Bauerly maintains for the K-9

Unit. During 2014, Sands and Rico participated in 91 practice hides during WCSO K-9 training. The records indicate that Rico had three false positive indications for the odor of drugs during those practice sessions. Bauerly testified that based on his experience, Sands and Rico trained more than enough to maintain their reliability and were in compliance with all USPCA standards and WCSO training requirements.

*Expert Testimony.* Sergeant Wendell Nope testified for the Government. He has been training police dogs and handlers for 30 years and serves as the K-9 Training Supervisor for the Peace Officer Standards and Training (POST) Division of the Utah Department of Public Safety. He is also a certified judge for various agencies and competitions, including the State of Utah, the Utah Peace Officer Association K-9 Trial, the Regional Police Dog Championship, the United States National Police Dog Championship and the International Law Enforcement Games K-9 Competition.

Nope testified that in his opinion, based on his review of records, Sands and Rico were well-trained, were certified by a bona fide police dog organization and were completely-functional as a narcotic detection team. He stated that in the police dog industry there is no uniform, standard number of hours required for initial or maintenance training. He also explained that the training methods taught by the Randy Hare School, which were used to train Rico, are accepted and highly respected in the industry. In Nope's opinion, Sands and Rico participated in a sufficient amount of training. He commended WCSO on the level of detail in the training records and its candor in documenting mistakes. He stated that despite three false positives during training in 2014, Rico was a highly competent and reliable canine. Nope pointed out that according to the training records, two of the false positives occurred on the same day and that remedial and corrective action was taken immediately. He also explained

there are several reasons why a drug dog may falsely indicate during training, including the possibility that prior training on the same day might leave behind residual drug odors. He found it to be significant that Rico had not had another false positive since June 2014.

Based on his review of the video recording, Nope testified that the free air sniff of Simeon's vehicle was "practically textbook." He stated that from the video alone, he could tell that the team was either very gifted or had a significant amount of training. Nope explained that there was no standard practice in law enforcement for conducting a free air vehicle sniff but, rather, each team has its own system for doing so. He testified that Sands and Rico executed a perfectly-acceptable sniff around Simeon's vehicle. He observed that Rico was intense and ready to work upon exiting the patrol car and that Sands guided Rico to the target vehicle and tapped on the rear panel of the vehicle to indicate to Rico that he should begin his work. He testified that Sands then continuously moved around the vehicle and only pointed to areas on the vehicle Rico had skipped. Nope stated that these actions did not improperly cue Rico to indicate.

Nope further testified that he observed Rico indicate on the driver's door by jumping up on the door and scratching at the window and door seam. He also explained that Sands then properly slowed his progress to give Rico time to pinpoint the exact source of the odor. According to Nope, this pause by Sands did not improperly cue Rico to indicate because he had already indicated by jumping on the vehicle. Nope also stated that Sands did not give Rico his ball, as a reward, until after Rico had indicated. He testified that rewarding a drug dog after an indication is not inappropriate and does not cue the dog to indicate falsely. In short, Nope concluded that Sands and Rico were a well-trained and reliable drug-detecting team and that the free air sniff of Simeon's vehicle was conducted in a proper manner.

Kyle Heyen testified as an expert for the defense. He is a private consultant and the owner of Detector Dogs International, Inc. He previously worked in law enforcement for 11 years and was trained and certified in police dog detection under the Utah standards. In fact, Heyen participated in Nope's training class. Heyen's certification expired in 1996 and he has not actively participated in training a dog team since 2002.

Heyen reviewed Rico's training records and the video of the free air sniff. He testified that in his opinion, Rico was not a well-trained police dog and the sniff of Simeon's vehicle was not reliable. Heyen testified that the training logs for Sands' and Rico's training in during [sic] 2013 and 2014 were not detailed enough to establish that Rico was well-trained and reliable. He took issue with Bauerly's narrative records of the various training sessions, stating they were not specific to Sands and Rico but, instead, also included exercises and hides involving other dog teams. Heyen also noted that the training Sands and Rico did on their own, outside of the official department training, was not documented or narrated.

Heyen testified that without documentation of the training Sands and Rico conducted on their own, they could not be considered well-trained. He also testified that there is no documentation that Rico "imprinted" on the four primary drug odors when he first began his training as a police dog. Thus, according to Heyen, there is no way to determine whether Rico actually learned those odors and can reliably detect them. Finally, Heyen took issue with the lack of detail in Rico's field-deployment records. He testified that based on the minimal documentation of Rico's actual performance in the field, it is impossible to determine if Rico is reliable.

In Heyen's opinion, the free air sniff of Simeon's vehicle was flawed and unreliable. He testified that the video reflects no true indication or alert behavior from Rico. Heyen

stated that Rico placed his paws on the vehicle five separate times: (1) on the back rear panel when the sniff began, (2) on the front passenger door, (3) on the driver's door, (4) a second jump on the driver's window and (5) on the door seam between the front seat and back seat. In Heyen's opinion, there were no significant differences in Rico's behavior during these events, meaning there is no way to distinguish the alleged indications from non-indications. Moreover, Heyen testified that Sands cued Rico to jump and seemingly indicate at the driver's door by stopping his progress. He testified that the handler should remain moving at a steady pace during a free air search and that by stopping, the handler is signaling for the dog that it is time to indicate. Heyen also testified that Deputy Sands improperly cued Rico to indicate by removing the toy ball from his pocket before Rico reached the back of the vehicle and concluded the sniff.

Heyen was also critical of the fact that Sands had Rico sniff only one vehicle in the parking lot. According to Heyen, a handler should have the dog sniff multiple vehicles, much like conducting a photo line-up. On cross-examination, however, Heyen acknowledged that there is no industry standard requiring that a team sniff multiple vehicles.

Report and Recommendation at 2-11 (footnote omitted).

## II.   LEGAL ANALYSIS

### A.   Standard Of Review

I review the magistrate judge's report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1):

A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the

> findings or recommendations made by the magistrate judge.
> The judge may also receive further evidence or recommit the
> matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see* FED. R. CIV. P. 72(b) (stating identical requirements); N.D.
IA. L.R. 72, 72.1 (allowing the referral of dispositive matters to a magistrate judge but
not articulating any standards to review the magistrate judge's report and
recommendation).  While examining these statutory standards, the United States Supreme
Court explained:

> Any party that desires plenary consideration by the Article III
> judge of any issue need only ask.  Moreover, while the statute
> does not require the judge to review an issue *de novo* if no
> objections are filed, it does not preclude further review by the
> district judge, sua sponte or at the request of a party, under a
> *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985).  Thus, a district court may review *de novo*
any issue in a magistrate judge's report and recommendation at any time.  *Id.*  If a party
files an objection to the magistrate judge's report and recommendation, however, the
district court *must* "make a *de novo* determination of those portions of the report or
specified proposed findings or recommendations to which objection is made." 28 U.S.C.
§ 636(b)(1).  In the absence of an objection, the district court is not required "to give any
more consideration to the magistrate's report than the court considers appropriate."
*Thomas*, 474 U.S. at 150.

*De novo* review, of course, is nondeferential and generally allows a reviewing
court to make an "independent review" of the entire matter.  *Salve Regina College v.
Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen *de novo* review is compelled,
no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620-19
(2004) (noting *de novo* review is "distinct from any form of deferential review").  The
*de novo* review of a magistrate judge's report and recommendation, however, only means

a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-1609, at 3, *reprinted in* 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))). Thus, while *de novo* review generally entails review of an entire matter, in the context of § 636 a district court's required *de novo* review is limited to "*de novo* determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any *issue* need only ask." (emphasis added)). Consequently, the Eighth Circuit Court of Appeals has indicated *de novo* review would only be required if objections were "specific enough to trigger *de novo* review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger *de novo* review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit Court of Appeals has been willing to "liberally construe[]" otherwise general pro se objections to require a *de novo* review of all "alleged errors," *see Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995), and to conclude that general objections require "full *de novo* review" if the record is concise, *Belk*, 15 F.3d at 815 ("Therefore, even had petitioner's objections lacked specificity, a *de novo* review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require *de novo* review, it is clear to me that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Assoc., Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate."). Therefore, I will strive to provide

*de novo* review of all issues that might be addressed by any objection, whether general or specific, but will not feel compelled to give *de novo* review to matters to which no objection at all has been made.

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting *de novo* review with "clearly erroneous standard" of review, and recognizing *de novo* review was required because objections were filed). I am unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Med. Clinic, P.C.*, 498 F.3D 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a

definite and firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than *de novo* is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads me to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* FED. R. CIV. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, I believe one further caveat is necessary: a district court always remains free to render its own decision under *de novo* review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153-54. Thus, while a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and I may choose to apply a less deferential standard.[1]

---

[1]The Eighth Circuit Court of Appeals, in the context of a dispositive matter originally referred to a magistrate judge, does not review a district court's decision in similar fashion. The Eighth Circuit Court of Appeals will either apply a clearly erroneous or plain error standard to review factual findings, depending on whether the appellant originally objected to the magistrate judge's report and recommendation. *See United States v. Brooks*, 285 F.3d 1102, 1105 (8th Cir. 2002) ("Ordinarily, we review a district court's factual findings for clear error . . . . Here, however, the record reflects that [the appellant] did not object to the magistrate's report and recommendation, and therefore we review the court's factual determinations for plain error." (citations omitted)); *United States v. Looking*, 156 F.3d 803, 809 (8th Cir. 1998) ("[W]here the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error."). The plain

As noted above, Simeon has filed objections to Judge Strand's Report and Recommendation. I, therefore, undertake the necessary review of Judge Strand's recommended disposition of Simeon's motion to suppress.

### B.    Objections To Report and Recommendation

#### 1.    Newly raised issues

Simeon raises the following two new issues in her objections to Judge Strand's Report and Recommendation: (1) that the search of her hotel room was improper, and (2) she invoked her right to an attorney. Simeon contends that she is justified in her late

---

error standard of review is different than a clearly erroneous standard of review, *see United States v. Barth*, 424 F.3d 752, 764 (8th Cir. 2005) (explaining the four elements of plain error review), and ultimately the plain error standard appears to be discretionary, as the failure to file objections technically waives the appellant's right to appeal factual findings, *see Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994) (stating an appellant who did not object to the magistrate judge's report and recommendation waives his or her right to appeal factual findings, but then choosing to "review[] the magistrate judge's findings of fact for plain error"). An appellant does not waive his or her right to appeal questions of law or mixed questions of law and fact by failing to object to the magistrate judge's report and recommendation. *United States v. Benshop*, 138 F.3d 1229, 1234 (8th Cir. 1998) ("The rule in this circuit is that a failure to object to a magistrate judge's report and recommendation will not result in a waiver of the right to appeal '"when the questions involved are questions of law or mixed questions of law and fact."'" (quoting *Francis v. Bowen*, 804 F.2d 103, 104 (8th Cir. 1986), in turn quoting *Nash v. Black*, 781 F.2d 665, 667 (8th Cir. 1986))). In addition, legal conclusions will be reviewed de novo, regardless of whether an appellant objected to a magistrate judge's report and recommendation. *See, e.g., United States v. Maxwell*, 498 F.3d 799, 801 n.2 (8th Cir. 2007) ("In cases like this one, 'where the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error.' We review the district court's legal conclusions *de novo*." (citation omitted)).

raising of these issues because she claims that she was not provided a usable copy of her interview until after the evidentiary hearing. The prosecution responds that Simeon was provided a copy of the disk containing her interview one and one-half months prior to the evidentiary hearing. The prosecution also notes that at no point prior to the evidentiary hearing did Simeon complain of not being able to open the recording and that it was only at the time of oral arguments that Simeon first complained about being unable to open the disk. The prosecution further points out that one and one-half months prior to the evidentiary hearing, Simeon was provided a report in which law enforcement noted that Simeon had asked Officer Benson if she could call an attorney. The prosecution argues that this demonstrates that Simeon knew, or should have known of the issue, one and one-half months before the evidentiary hearing. Simeon has not contested the prosecution's representations. The prosecution argues that I should deny this issue as untimely.

Simeon also seeks to challenge the legality of the search of the hotel room. This, again, was not an issue raised before Judge Strand. Moreover, at no point did Simeon seek to amend her motion to suppress, or brief the issue. Simeon does not offer any explanation for her delay in raising this issue. The prosecution asserts that, as a result, it has not had an opportunity to present testimony on the issue, or to brief it, and argues that I should also deny this issue as untimely.

Simeon did not raise these two issues in her motion to suppress. Rather, they were first raised in her objections to Judge Strand's Report and Recommendation. Thus, Judge Strand never had the opportunity to consider either issue. Federal courts have repeatedly held that while the Magistrate Judge Act, 28 U.S.C. § 631 *et seq.*, permits *de novo* review by the district court if timely objections are filed, absent compelling reasons, it does not allow parties to raise new arguments or issues before the district court that were not presented to the magistrate. *Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir.

2000) (holding that "issues raised for the first time in objections to [a] magistrate judge's report and recommendation are deemed waived."); *United States v. Waters*, 158 F.3d 933, 936 (6th Cir. 1998) ("issues raised for the first time in objections to magistrate judge's report and recommendation are deemed waived") (citing *Marshall v. Chater*, 75 F.3d 1421, 1426-27 (10th Cir. 1996)); *Borden v. Secretary of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987) ("Appellant was entitled to a de novo review by the district court of the recommendations to which he objected, however he was not entitled to a de novo review of an argument never raised. 'The purpose of the Federal Magistrate's Act is to relieve courts of unnecessary work.' It would defeat this purpose if the district court was required to hear matters anew on issues never presented to the magistrate. Parties must take before the magistrate, 'not only their 'best shot' but all of their shots.' This concept is premised on the same basis as the rule that an appellate court will not consider arguments not raised below except in the most compelling circumstances. Thus, here the district court judge properly refused to consider an argument which could have been, but inexplicably was not, presented to the magistrate in the first instance" (citations omitted)); *see also Becker v. Clermont Cntv. Prosecutor,* 450 Fed. App'x 438, 439 (6th Cir. 2011); *Glidden v. Kinsella*, 386 Fed. App'x 535, 544 n.2 (6th Cir. 2010); *Cupit v. Whitley*, 28 F.3d 532, 535 (5th Cir. 1994); *Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988); *Mitchell v. Cnty. of Washtenaw*, No. 06–13160, 2009 WL 909581, at *4 (E.D. Mich. Mar.31, 2009); *Anna Ready Mix, Inc. v. N.E. Pierson Constr. Co., Inc.*, 747 F. Supp. 1299, 1302-03 (S.D. Ill. 1990). Accordingly, Simeon has waived these two claims by failing to raise them before Judge Strand.

Alternatively, assuming for the sake of argument that Benson was required to have a search warrant to search the hotel room if Simeon had not yet checked out, I find that Simeon has not carried her burden of establishing that she had not yet checked out of the

hotel room at the time Benson searched it and seized the baggie.[2]  Accordingly, Simeon

has not established that she still had a constitutionally protected privacy interest in the

hotel room at the time of the search.  *See Rawlings v. Kentucky*, 448 U.S. 98, 104–05

(1980); *Rakas v. Illinois*, 439 U.S. 128, 131 n. 1 (1978).  Simeon's objections are

denied.[3]

---

[2]The Supreme Court and the Eighth Circuit Court of Appeals have long recognized that the constitutional protection against unreasonable searches and seizures of a home or an apartment apply with equal force to a person's privacy in a temporary dwelling place such as a hotel room.  *See Hoffa v. United States*, 385 U.S. 293, 301 (1966); *Stoner v. California*, 376 U.S. 483, 490 (1964); *United States v. Leverington*, 397 F.3d 1112, 1114 (8th Cir. 2005); *United States v. Williams*, 346 F.3d 796, 798 (8th Cir. 2003); *United States v. Conner*, 127 F.3d 663, 666 (8th Cir. 1997); *United States v. Roby*, 122 F.3d 1120, 1125 (8th Cir. 1997); *United States v. Rambo*, 789 F.2d 1289, 1295 (8th Cir. 1986); *see also United States v. Williams*, 521 F.3d 902, 906 (8th Cir. 2008); *United States v. Padilla*, 869 F.2d 372, 379 (8th Cir. 1989).  "[W]hether a person has a reasonable expectation of privacy in a motel room depends upon factors such as whether the defendant was ever in the room and whether the defendant checked into or paid for the room."  *United States v. Esquivias*, 416 F.3d 696,  (8th Cir. 2005); *see United States v. Carter*, 854 F.2d 1102, 1105–06 (8th Cir. 1988).  Generally, a hotel guest no longer has a reasonable expectation of privacy in his or her hotel room after his or her rental period has terminated.  *See United States v. Larson*, 760 F.2d 852, 855 (8th Cir. 1985); *see also United States v. Lanier*, 636 F.3d 228, 232 (6th Cir. 2011); *United States v. Dorais*, 241 F.3d 1124, 1129–30 (9th Cir. 2001); *United States v. Gill*, 16 Fed. App'x 850, 854 (10th Cir. 2001); *United States v. Kitches*, 114 F.3d 29, 31 (4th Cir. 1997); *United States v. Allen*, 106 F.3d 695, 699 (6th Cir. 1997); *United States v. Huffhines*, 967 F.2d 314, 318 (9th Cir. 1992); *United States v. Rahme*, 813 F.2d 31, 34 (2d Cir. 1987).

[3]Because I find that the search of the hotel room did not violate Simeon's Fourth Amendment rights, the fruit of the poison tree doctrine does not apply to her statements.

## 2.    *Probable cause to search car before dog sniff*

Simeon objects to Judge Strand's conclusion that probable cause existed to search Simeon's car before Sands and Rico conducted the free air dog sniff. Simeon does not contest Judge Strand's recitation of the law concerning the automobile exception, but disagrees with his view that the facts support a finding of probable cause.

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted)). "The so-called 'automobile exception' permits police to conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the vehicle contains contraband or other evidence of a crime."[4] *United States v. Kennedy*, 427 F.3d 1136, 1140-41 (8th Cir. 2005); *see United States v. Vore*, 743 F.3d 175, 1179 (8th Cir. 2014); *United States v. Brown*, 634 F.3d 435, 438 (8th Cir. 2011). "'Probable cause sufficient to justify a search

---

[4]In addition, in order for the automobile exception to the search warrant requirement to apply, Simeon's car "must have been 'readily capable' of 'being used on the highways' and must have been "found stationary in a place not regularly used for residential purposes[.]'" *United States v. Holleman*, 743 F.3d 1152, 1158 (8th Cir. 2014) (quoting *California v. Carney*, 471 U.S. 386, 392 (1985)). Simeon does not contend that her car was incapable of being used on the highways or that a hotel parking lot qualifies as a place regularly used for residential purposes. *See United States v. Washburn*, 383 F.3d 638, 641–42 (7th Cir. 2004) ("We have always rejected the notion that a hotel occupant enjoys the same expectation of privacy in his car in the parking lot of the hotel as he does in the room itself; the hotel parking lot is readily accessible to the public and not generally thought of as a place normally used as a residence." (internal quotation marks and citation omitted)); *United States v. Diaz*, 25 F.3d 392, 396–97 (6th Cir. 1994) (holding that motel guests have no reasonable expectation of privacy in a motel's parking lot); *United States v. Foxworth*, 8 F.3d 540, 545 (7th Cir.1993) (observing that a hotel parking lot is "readily accessible to the public and not generally thought of as a place normally used as a residence.").

exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Vore*, 743 F.3d at 1179 (quoting *Kennedy*, 427 F.3d at 1141); *see United States v. Martinez*, 78 F.3d 399, 401 (8th Cir. 1996). Probable cause "is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States Colbert*, 605 F.3d 573, 577 (8th Cir. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1984)). In making the probable-cause determination, I "'apply a common sense approach and consider all relevant circumstances.'" *Vore*, 743 F.3d at 1179 (quoting *Kennedy*, 427 F.3d at 1141).

Judge Strand concluded that probable cause existed to search Simeon's car before Sands and Rico conducted the free air dog sniff. Judge Strand based his finding on the following facts: first, methamphetamine was found in a hotel room registered to Simeon; second, the evidence indicated that no one other than Simeon, her husband, and the housekeeper had entered the hotel room; third, after being detained, Simeon made a telephone call in which she sought to have her car removed from the parking lot and then falsely told Sands that her car had already been removed; fourth, Simeon admitted using methamphetamine the previous day and that she had a prior drug-related arrest; and finally, Simeon and her husband were very nervous while being interviewed.[5] Simeon disagrees with Judge Strand's determination of probable cause based on these facts and seeks to have me analyze the circumstances in isolation.

---

[5]Simeon objects to Judge Strand's factual finding that Simeon told Sands that her car "probably had been picked up by a friend and was no longer at the Casino." Defendant's Obj. at 5; Report and Recommendation at 4. Judge Strand was not quoting Simeon in this finding, but merely paraphrasing her statement to Sands. Simeon actually told Sands that her car was likely gone, stating "they probably came and got it I think." Gov't Ex. 9 at 2:11.

Even if Simeon's individual actions might be innocently explained, as Simeon argues, her behavior "must be considered as a whole and in the light of the officers' 'experience and specialized training.'" *United States v. Ameling*, 328 F.3d 443, 448 (8th Cir. 2003) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). In *Arvizu*, the United States Supreme Court reversed a suppression order, criticizing the court of appeals for evaluating seven factors "in isolation from each other" and giving them "no weight" because each "was by itself readily susceptible to an innocent explanation." *Id.* at 274. In considering the totality of the circumstances, I agree with Judge Strand and conclude that there were "sufficient facts to lead a prudent person to believe that there [was] a 'fair probability that contraband or evidence of a crime'" would be found in Simeon's car before the dog sniff occurred. *United States v. Grant*, 490 F.3d 627, 631 (8th Cir. 2007) (quoting *United States v. Watford*, 439 F.3d 836, 841 (8th Cir. 2006)). Accordingly, I find that Judge Strand correctly concluded that the search of Simeon's car was justified under the automobile exception to the warrant requirement and Simeon's objection is denied.

### 3. *Probable cause to search car after dog sniff*

Finally, Simeon objects to Judge Strand's conclusion that probable cause to search Simeon's car was provided by Rico's free air dog sniff because Rico was properly certified and trained, the free air sniff was properly done, and Rico indicated and was not cued. Simeon contends that Rico was not properly trained or certified and, therefore, was not reliable. She also argues that Sands improperly cued Rico to indicate and, therefore, Rico did not legitimately alert or indicate to the odor of drugs. Simeon contends that, because of these flaws, Rico's free air sniff did not establish probable cause to search her vehicle.

A dog sniff of the exterior of a vehicle does not violate the Fourth Amendment. *United States v. Rivera*, 570 F.3d 1009, 1012 (8th Cir. 2009) (citing *Illinois v. Caballes*,

543 U.S. 405, 409–10 (2005)).  "[A]n alert or indication by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person or for the search of a vehicle." *United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010), *see United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999); *see also United States v. Perez*, 440 F.3d 363, 374 (6th Cir. 2006).  A drug dog is considered reliable when it has been "trained and certified to detect drugs and a detailed account of the dog's track record or education is unnecessary." *United States v. Olivera–Mendez*, 484 F.3d 505, 512 (8th Cir. 2007).  The relevant question is "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida v. Harris*, 133 S. Ct. 1050, 1058 (2013).

In *Harris*, the United States Supreme Court outlined the framework courts should use in determining whether a drug dog sniff is reliable enough to give law enforcement officers probable cause to conduct a search.  *See United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015).  The Court instructed that the appropriate inquiry is "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime.  A sniff is up to snuff when it meets that test." *Harris*, 133 S. Ct. at 1058. The Court noted that more emphasis should be placed on a dog's performance in controlled settings than its performance "in the field." *Id*. at 1056.  The Court observed that:

> [T]he decision below treats records of a dog's field performance as the gold standard in evidence, when in most cases they have relatively limited import. Errors may abound in such records. If a dog on patrol fails to alert to a car containing drugs, the mistake usually will go undetected because the officer will not initiate a search…. Conversely (and more relevant here), if the dog alerts to a car in which

> the officer finds no narcotics, the dog may not have made a
> mistake at all. The dog may have detected substances that
> were too well hidden or present in quantities too small for the
> officer to locate. Or the dog may have smelled the residual
> odor of drugs previously in the vehicle or on the driver's
> person.

*Id.* The Supreme Court further noted that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Id.* at 1057. The Court concluded that "a court can presume (subject to any conflicting evidence offered) that [a] dog's alert provides probable cause to search" if "a bona fide organization has certified a dog after testing his reliability in a controlled setting . . . [or] if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs." *Id.* at 1057. "This presumption may be overcome if a defendant can show, either through cross-examination or introducing his own fact or expert witness, the inadequacy of a certification or training program or that the circumstances surrounding a canine alert undermined the case for probable cause." *Gonzalez*, 781 F.3d at 429 (citing *Harris*, 133 S. Ct. at 1057–58.

### a.  *Rico's training and certification*

Here, the record shows that Sands and Rico trained nearly every day in 2013, on their own time and with the K-9 Unit, preparing Rico to be a drug detection dog and to pass the certification test. This training often included working with Trobaugh, a certified dog trainer, instructor, and judge for the USPCA certification tests. Their training sessions included imprinting Rico on the major drug odors, using scratch boxes to hide narcotics, using reward-style training techniques and other training techniques in the Randy Hare method. In March 2014, Rico and Sands passed the USPCA certification test and Rico was certified as a drug detection dog. In passing the certification test, Rico found all four drug hides and had no false positive indications. Following Rico's

certification, test, Rico and Sands continued maintenance training. They also began active duty and deployments as a drug detection dog team. Rico's training was documented by Bauerly in his official training logs for the WCSO K-9 Unit. These training logs detail each training session, including the types of training involved, the narcotics that were hidden, the locations and heights of the hides, each dog's performance, any mishandling or mistakes by the team, and the type, if any, of remedial training that occurred. These training logs indicate that Rico had three false positive indications out of 91 training exercises in 2014. Rico continued to be a certified drug detection dog when he was deployed to sniff Simeon's car.

Simeon objects to Judge Strand's finding that Rico was properly certified and trained, arguing that the WCSO's K-9 Unit training logs are insufficient to establish Rico's reliability and training because the logs lack sufficient information about Sands and Rico's individual training. Simeon bases her argument on Heyen's testimony that the training records should have more detail about some of the training tools used, what remedial training was used on Rico, and his response to those training techniques. Heyen's testimony was contradictory to Nope's. I note that Heyen has not actively participated in training a dog team since 2002, and has not been certified in police drug detection training since 1996. Nope, on the other hand, has 30 years of experience training police dogs and handlers and serves as the K-9 Training Supervisor for the Peace Officer Standards and Training Division of the Utah Department of Public Safety. Nope testified that the WCSO's K-9 Unit training logs were sufficiently detailed and adequately explained the training exercises, tools used, and the remedial measures taken. He commended WCSO's K-9 Unit's level of detail in the training records and its candor in documenting mistakes. Nope testified that in his opinion, based on his review of records, Sands and Rico were well-trained, were certified by a bona fide police dog organization, and were completely-functional as a narcotic detection team. He stated that despite three

false positives during training in 2014, Rico was a highly competent and reliable drug detection dog.

I agree with Judge Strand's conclusion that Rico is properly trained and certified by a bona fide organization after satisfactorily performing in a certification or training program which tested his reliability in a controlled setting. Although Simeon's expert testified that he was unsatisfied with aspects of Rico's training and qualifications, Rico has maintained his certification and undergone continuous training, and, as the Supreme Court observed in Harris, "law enforcement units have . . . [a] strong incentive to use effective training and certification programs, because only accurate drug-detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources." *Id*. at 1057. Simeon's objection is denied.

### b.    *The free air sniff*

Simeon also objects to Judge Strand's finding that Sands deployed Rico correctly. Simeon again relies on Heyen's testimony. Heyen was critical of Sands's failure to initiate a free air sniff around other vehicles in the parking lot and alleged cueing behavior by Sands, including coming to a stop while on the driver's side and reaching into his pocket for Rico's toy ball. Concerning his criticism about not having Rico conduct sniffs of surrounding vehicles, Heyen acknowledged that this is simply his personal standard. He further admitted, and Nope agreed, that there is no standardized deployment practice for drug detector dogs and that each team has its own methods for completing a free air sniff.

Sands and Rico deployed in their usual manner and Nope testified he had no concerns with the team's standard deployment practice and that he considered the free air sniff of Simeon's vehicle to be "textbook." Accordingly, I agree with Judge Strand that Simeon has failed to show that the sniff was unreliable due to Sands's failure to have Rico sniff other vehicles in the parking lot.

Concerning Heyen's criticism that Sands cued Rico to indicate, Nope, Trobaugh, Bauerly, and Sands each testified to the contrary. Based on their review of the video, Nope, Trobaugh, and Bauerly testified that Sands properly stopped his progress only after Rico had already indicated to the odor of drugs by jumping on the driver's door. That is, Sands paused to allow Rico to "work" by pinpointing the precise source of the odor. Heyen acknowledged that this technique of allowing a drug dog to "work" is an appropriate reason to change the dog's pace around the vehicle and is not a cue. His interpretation of the video, however, is that Sands stopped before Rico's behavior changed, thus cueing the behavior. From my viewing of the recording, I agree with Judge Strand's finding that Rico's behavior changed noticeably once he came to the front corner of Simeon's car and began sniffing downwind on the driver's side. He became markedly more intense, jumped on the car, and began scratching. Sands, Nope, Trobaugh, and Bauerly agreed that this was Rico's indication to the odor of drugs. Similarly, from my viewing of the recording, I agree with Judge Strand that Rico had already jumped and scratched on the driver's side of Simeon's car before Sands reached into his pocket. Thus, Simeon's objection regarding how Rico was deployed is denied.

### c.     *Rico's indication*

Finally, Simeon objects to Judge Strand's finding that Rico did alert to Simeon's car. Simeon's objection is, again, based on Heyen's testimony that the recording does not show any significant change in Rico's behavior that could be characterized as either an alert or an indication. Nope, Bauerly, and Trobaugh each testified that the dog's handler is in the best position to know when the dog's natural behavior changes because that handler has trained with the dog and can notice small changes in the dog's general demeanor. Sands, Rico's handler, testified that immediately before jumping on the driver's door of Simeon's car, Rico's behavior, intensity, body language, and breathing changed. Sands testified that Rico was in alert status. Sands's testimony was

corroborated by the other witness testimony and from my own viewing of the recording of Rico's sniff.   Rico's behavior changed markedly before he jumped and scratched on the driver's door.   Thus, I find, based on Sands's testimony and my own review of the recording, that Rico entered alert status and then indicated at the driver's side of Simeon's car.   Accordingly, Simeon's objection is denied.

### 4.    *Combination of free air sniff and other information establishing probable cause*

Based on her previous objections, Simeon also objects to Judge Strand's finding that the information already known to Sands, when combined with the outcome of Rico's free air sniff, established probable cause to search Simeon's care.   For the reasons discussed above, I have rejected all of Simeon's prior objections.   Considering the totality of the circumstances, the facts are easily sufficient for a reasonably prudent person to believe Simeon had illegal drugs in her car.   Methamphetamine had been found in a hotel room registered to Simeon earlier that day.   No one other than Simeon and her husband had entered or exited their hotel room before the housekeeper.   She had admitted to having a prior drug arrest and had used methamphetamine the day before.   Simeon made an effort to have someone retrieve her vehicle from the Casino lot and then falsely represented to Sands that it had already been removed.   Simeon and her husband were overly nervous in their behavior.   Finally, Rico, trained and certified in drug detection, had indicated to the odor of narcotics in Simeon's car.   Therefore, Simeon's objection is denied.

### 5.    *Subsequent searches*

Finally, Simeon objects to Judge Strand's conclusion that there was no basis to suppress evidence found as a result of the execution of a search warrant obtained by the prosecution after Simeon's car was searched.   Simeon argues that if the search of her car was illegal, then any evidence found during the subsequent searches of her phones must

also be suppressed as fruits of the poisonous tree. For the reasons discussed above, the search of Simeon's car was supported by probable cause. Because the evidence the prosecution relied upon to obtain that search warrant was gathered lawfully, there is no basis to suppress the evidence gathered from the warrant's execution. Accordingly, Simeon's objection is denied.

### III. CONCLUSION

Therefore, for the reasons discussed above, I, upon a *de novo* review of the record, accept Judge Strand's well-crafted and well-reasoned Report and Recommendation and deny defendant Simeon's motion to suppress.

**IT IS SO ORDERED**.

**DATED** this 20th day of July, 2015.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA